**TEXAS RICE LAND PARTNERS, LTD., and Mike Latta, Appellants,**

v.

**DENBURY GREEN PIPELINE–TEXAS LLC, Appellee.**

No. 09–09–002–CV.

Court of Appeals of Texas, Beaumont.

Submitted June 11, 2009.

Decided Sept. 24, 2009.

Marcus A. Pitre, Wright & Pitre, Port Neches, Anthony G. Brocato, Law Office of Anthony G. Brocato, Beaumont, for appellants.

Thomas H. Buchanan, Jack T. Strother, Melanie S. Reyes, Flowers Davis, P.L.L.C., Tyler, for appellee.

Before McKEITHEN, C.J., GAULTNEY and KREGER, JJ.

## OPINION

CHARLES KREGER, Justice.

This is an appeal from a final summary judgment granting Denbury Green Pipeline–Texas LLC ("Denbury Green") a permanent injunction against appellants, Texas Rice Land Partners, Ltd. and Mike Latta (collectively "Texas Rice"). After Texas Rice repeatedly refused to allow Denbury Green to enter the subject property to conduct surveys for the location

and placement of a carbon dioxide pipeline, Denbury Green filed an Original Petition for Temporary Restraining Order and for Temporary and Permanent Injunction to prevent Texas Rice from interfering with Denbury Green's alleged right to enter the property as a common carrier. After the presentation of evidence and argument by both parties, the trial court granted Denbury Green's request for temporary injunction. Thereafter, the parties filed cross motions for summary judgment. The trial court entered judgment for Denbury Green permanently restraining Texas Rice from interfering with Denbury Green's survey rights.

The trial court found that Denbury Green proved as a matter of law that Denbury Green "is a common carrier pursuant to Section 111.002(6) of the Texas Natural Resources Code," and has "the power of eminent domain/authority to condemn/right-to-take pursuant to Section 111.019 of the Texas Natural Resources Code." The trial court further permanently enjoined Texas Rice and its tenant, Mike Latta, from interfering or attempting to interfere with Denbury Green's right to enter and survey the route along which Denbury Green's proposed pipeline would follow across Texas Rice's land.[1]

Texas Rice appeals the trial court's judgment. In two issues, Texas Rice contends that the trial court erred in granting the motion for summary judgment in favor of Denbury Green and in denying summary judgment for Texas Rice. Because we find that Denbury Green established its common carrier status as a matter of law, such finding is dispositive of both issues on appeal and, therefore we affirm the judgment of the court below.

## STANDARD OF REVIEW

Appellate courts review a trial court's grant of a traditional motion for summary judgment de novo. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex.2003). To prevail on a traditional motion for summary judgment, the movant must establish that there is no genuine issue of material fact so that the movant is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex.2005). We must determine whether the movant carried its burden to establish that there existed no genuine issue of material fact and that it was entitled to judgment as a matter of law. *Shah v. Moss*, 67 S.W.3d 836, 842 (Tex.2001). We assume all evidence favorable to the nonmovant is true, indulge every reasonable inference in favor of the nonmovant, and resolve any doubts in his favor. *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex.2004). "A plaintiff moving for summary judgment must prove that it is entitled to summary judgment as a matter of law on each element of its cause of action." *Winchek v. Am. Express Travel Related Servs. Co.*, 232 S.W.3d 197, 201 (Tex.App.-Houston [1st Dist.] 2007, no pet.). Once the movant conclusively establishes its cause of action, the burden shifts to the nonmovant to respond with evidence raising a genuine issue of material fact that would preclude summary judgment. *See Rhone–Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 222–23 (Tex.1999).

## COMMON CARRIER STATUS

The Texas Natural Resources Code provides, in pertinent part:

A person is a common carrier subject to the provisions of this chapter if it:

1. Texas Rice was further enjoined from harassing Denbury Green or any of its agents, servants, representatives, employees, or any independent contractors with whom Denbury Green has contracted while upon Texas Rice's land conducting such surveys.

. . . .

(6) owns, operates, or manages, wholly or partially, pipelines for the transportation of carbon dioxide or hydrogen in whatever form to or for the public for hire, but only if such person files with the commission a written acceptance of the provisions of this chapter expressly agreeing that, in consideration of the rights acquired, it becomes a common carrier subject to the duties and obligations conferred or imposed by this chapter[.]

TEX. NAT. RES.CODE ANN. § 111.002(6) (Vernon Supp. 2008). Common carriers in Texas have the right and power of eminent domain. *Id.* § 111.019(a) (Vernon 2001). "In the exercise of the power of eminent domain . . ., a common carrier may enter on and condemn the land . . . of any person or corporation [when] necessary for the construction, maintenance, or operation of the common carrier pipeline." *Id.* § 111.019(b).

■ Whether a pipeline company is a common carrier is a question of law. *See Vardeman v. Mustang Pipeline Co.,* 51 S.W.3d 308, 312 (Tex.App.-Tyler 2001, pet. denied). Moreover, in making that determination, the courts must give great weight to determinations made by the Texas Railroad Commission ("TRC"). *See id.* (citing *State v. Public Util. Comm'n of Tex.,* 883 S.W.2d 190, 196 (Tex.1994)). The *Vardeman* court explained:

The authority of a pipeline company to condemn property is to be determined as a matter of law by the trial court. However, when determining whether [a pipeline company] is a common carrier under section 111.002(6) of the Texas Natural Resources Code, we have been instructed by the supreme court to give great weight to the TRC's determination of that issue. When the evidence before the court indicates that a pipeline . . . has subjected itself to the authority of

the TRC to regulate its activities, then it is a common carrier.

*Id.* at 312–13 (citations omitted).

In *Vardeman,* Mustang Pipeline Company attached as evidence a letter from the TRC, which stated as follows:

A review of Commission records indicates that Mustang has met the requirements of § 111.02(6) of the Texas Natural Resources Code for common carrier status. First, Mustang has subjected itself to the jurisdiction of the Commission by declaring on its T–4 application for permit to operate a pipeline that it is a common carrier. Second, Mustang has held itself out to the public for hire as evidenced by its Texas Local Tariff No. M–3 on file with the Commission. Therefore, Mustang is a common carrier subject to the jurisdiction of the Commission.

*Id.* at 313. The court concluded that "[w]ith the letter, Mustang established in its motion for summary judgment that it had subjected itself to the regulatory jurisdiction of the TRC." *Id.* The court also found significant that Mustang attached deposition testimony of an authorized Mustang representative, who testified that Mustang had filed a tariff with the TRC outlining Mustang's public rates for transmitting ethylene. *Id.* The representative further testified that there had been negotiations with companies other than Mustang's parent company to carry products through the pipeline. *Id.* The court concluded that these facts supported both the TRC's determination and Mustang's own contention that it was a common carrier. *Id.*

Similarly, in *Lohmann v. Gulf Ref. Co.,* 682 S.W.2d 612 (Tex.App.-Beaumont 1984, no pet.), we considered whether the trial court's finding in a bench trial that Gulf Refining Company was a common carrier was supported by the evidence. *Id.* at

613–14. Gulf Refining had received permits from Jefferson County and the State of Texas to construct and maintain a common carrier pipeline. *Id.* at 614. After the line was laid, Gulf Refining applied for and received a common carrier pipeline permit from the TRC. *Id.* Gulf Refining then published and distributed tariffs advising the public of the line's availability and the rates charged. We determined, based on these facts, that the trial court's judgment that Gulf Refining was a common carrier was supported by the evidence. *Id.* at 614–15.

■ Like the pipeline company in *Vardeman,* the summary judgment evidence in this case shows that Denbury Green submitted itself to the jurisdiction of the TRC. On March 19, 2008, Denbury Green applied for a T–4 permit to operate a carbon dioxide pipeline as a common carrier in the State of Texas. On March 25, 2008, pursuant to section 111.002(6), Denbury Green filed with the TRC its written acceptance of the provisions of Chapter 111 of the Texas Natural Resources Code and expressly agreed that it was a common carrier, and that it was subject to the duties and obligations conferred or imposed by Chapter 111. On April 2, 2008, the TRC issued a T–4 permit to Denbury Green. On July 11, 2008, the Gas Services Division of the TRC declared Denbury Green to be a common carrier for purposes of transporting carbon dioxide in the State of Texas. The letter from the TRC stated as follows:

> This letter is to confirm the fact that Denbury Green Pipeline–Texas LLC has been granted a permit to operate a pipeline . . . and has made all of the currently necessary filings to be classified as a common carrier pipeline for transportation of carbon dioxide under the provisions of Texas Natural Resources Code § 111.002(6) and as otherwise required by the Railroad Commission.

Further, on November 7, 2008, Denbury Green filed its tariff with the TRC. Additionally, the record includes an affidavit from Ray Dubuisson, Denbury Green's Vice President of Land. Dubuisson states that "Denbury Green is currently negotiating with other entities to transport anthropogenic carbon dioxide once the construction of the pipeline is complete." Additionally, in his deposition Dubuisson acknowledged that Denbury Green may transport other entities' carbon dioxide, "from anywhere near the pipeline." These facts support Denbury Green's contention that it is a common carrier.

Texas Rice argues that a genuine issue of material fact exists as to whether Denbury Green is a common carrier, asserting that Denbury Green's pipeline is actually a private line as opposed to a pipeline to transport to or for the public for hire. Texas Rice relies upon the holding in *China–Nome Gas Co. v. Riddle,* 541 S.W.2d 905 (Tex.Civ.App.-Waco 1976, writ ref'd n.r.e.), to support its contention that Denbury Green's pipeline is a private line to be used for private purposes.

*China–Nome* involved an interlocutory appeal of a temporary injunction entered by the trial court to halt China–Nome, an oil and gas company, from further construction or use of a gas transmission pipeline being laid on property that had not been acquired through easement or condemnation, and did not include a motion for summary judgment. The narrow issue presented to the Waco Court of Appeals was whether the trial court clearly abused its discretion in ordering the temporary injunction. The court concluded that from the record presented in that case, while there was evidence that China–Nome was a common carrier, the record did not conclusively establish that fact. However, *China–Nome* is factually distinguishable from the case at issue. Unlike China–

Nome, before Denbury Green commenced construction of its pipeline, it applied for and was granted a permit to operate its carbon dioxide pipeline as a common carrier and had a tariff on file with the TRC, and Denbury Green contends it fully complied with the requirements of the Texas Natural Resources Code to conclusively prove it is a common carrier. Texas Rice had not presented any evidence that Denbury Green had not met the statutory requirements under the Texas Natural Resources Code to be authorized by the TRC as a common carrier. Instead, Texas Rice argues that, despite Denbury Green's filings with the TRC, there is no evidence that Denbury Green will operate the pipeline as a common carrier but, in fact, the pipeline will be used solely for private purposes.

We find *China–Nome* inapplicable to the facts of the present case. *See Vardeman,* 51 S.W.3d at 313 (distinguishing *China–Nome*). Because Denbury's Green's pipeline was not completed or operational at the time Texas Rice filed this lawsuit, there is no evidence in the record regarding Denbury's Green's actual use of the pipeline. Even if there was such evidence in the record, when determining public use, the existence of the public's right to use the pipeline controls over the extent to which that right is, or may be, exercised. *See Tenngasco Gas Gathering Co. v. Fischer,* 653 S.W.2d 469, 475 (Tex.App.-Corpus Christi 1983, writ. ref'd n.r.e.). "Texas courts have made it clear that it is the character of the right which inures to the public, not the extent to which the right is exercised, that is important in evaluating enterprises which are involved in condemning private property." *Id.* (citations omitted).

"It is immaterial if the use is limited to the citizens of a local neighborhood, or that the number of citizens likely to avail themselves of it is inconsiderable, so long as it is open to all who choose to avail themselves of it. The mere fact that the advantage of the use inures to a particular individual or enterprise, or group thereof, will not deprive it of its public character."

*Housing Auth. of the City of Dallas v. Higginbotham,* 135 Tex. 158, 143 S.W.2d 79, 84 (1940) (quoting *West v. Whitehead,* 238 S.W. 976, 978 (Tex.Civ.App.-San Antonio 1922, writ ref'd)). Unlike the pipeline company in *China–Nome,* which sought a common carrier permit after being in operation for many years, Denbury Green's pipeline will be available for public use from the outset of its operation. *See generally Vardeman,* 51 S.W.3d at 314 ("[T]he same facts which established that Mustang was a common carrier also established that the proposed use of Mustang's pipeline was for a public purpose.").

We conclude Denbury Green established its common carrier status as a matter of law. We overrule issue one. Because we overrule issue one, we overrule issue two and affirm the judgment of the court below.

AFFIRMED.

DAVID GAULTNEY, Justice, dissenting.

Genuine issues of material fact preclude summary judgment in this case. Denbury Resources, Inc. describes the oil production purpose of its "Green Pipeline" on its web page, a paper copy of which is in the record, as follows:

Our tertiary operations are our core assets and our principal focus.... During the last eight years, we have learned an extensive amount about tertiary operations and working with carbon dioxide ("CO2"), and our knowledge continues to grow. We like these tertiary operations because (i) tertiary investments provide a reasonable rate of return, even at relatively low oil prices of around $30 per

barrel, (ii) tertiary flooding exhibits a lower risk profile than conventional exploration and development, and (iii) to date, in our region of the United States, we have not encountered any industry competition. Generally, from the Texas Gulf Coast to Florida, there are no known significant natural sources of carbon dioxide except our own, and these large volumes of $CO_2$ are the foundation for our entire tertiary program.

. . . .

We believe that having sufficient $CO_2$ volumes is the key ingredient, if not the most important factor to our tertiary operations. We acquired our Jackson Dome ($CO_2$) source field in February 2001, giving us control of most of the $CO_2$ supply in Mississippi. . . .

. . . .

We have entered into three agreements, and are having various levels of discussions with many others, to purchase (if the plants are built) all of the $CO_2$ production from man-made (anthropogenic) sources of $CO_2$ from planned solid carbon gasification projects. . . .

. . . .

We see these sources as a possible expansion of our natural Jackson Dome source, assuming they are economical, and we believe that our potential ability to tie these sources together with pipelines will give us a significant advantage over our competitors, in our geographic area, in acquiring additional oil fields and these future potential man-made sources of $CO_2$.

. . . .

We are also working on a 24″ pipeline, named the Green Pipeline, to transport $CO_2$ to Hastings Field and our 2007 Southeast Texas acquisitions, Oyster Bayou, Fig Ridge and Gillock Fields. . . . Initially, we anticipate transporting $CO_2$ from our natural source at Jackson Dome in this line, but ultimately we expect that it will be used to ship predominately man-made (anthropogenic) sources of $CO_2$.

. . . .

During November 2006, we acquired an option to purchase, on September 1, 2008, or September 1, 2009, with an effective date of January 1 of the following year, Hastings Field, a strategically significant potential tertiary flood candidate located near Houston, Texas.

. . . .

We believe that Hastings Field possesses . . . potential from $CO_2$ tertiary floods, more reserve potential than any other single field in our inventory. Currently, we are working on the right-of-ways required to build a pipeline we have named our Green Pipeline to transport $CO_2$ to this field. . . . The Hastings Field was the first significant strategic addition in this area, giving us an anchor field in this region. We have already expanded our field inventory in this area as we purchased Oyster Bayou and Fig Ridge Fields with tertiary potential for $42 million in March 2007 and other small fields, Gillock Fields near Hastings Field, in late 2007. . . . [O]ur goal is to continue to pursue the acquisition of other fields in this area, which will help reduce the cost of $CO_2$ for each field by fully utilizing the proposed pipeline and thereby reducing our transportation cost per Mcf.

This declaration is some evidence Denbury intends to fully utilize the Green Pipeline as an essential part of its tertiary oil production operations. Denbury's description of the pipeline's purpose indicates the $CO_2$ it transports in the pipeline will be its own, whether purchased from man-made sources or supplied by its own Jackson Dome natural source. How then does Denbury Green have the power to take the

private property of another to accomplish this purpose?

Denbury relies on Chapter 111 of the Natural Resources Code as a grant of eminent domain. Eminent domain is the power to take private property for public use, and is essentially a right of the state to reassert its control over property for the public good. *See generally* TEX. CONST. art. I, § 17. The Texas Constitution limits the power of eminent domain. *See id.* The Constitution "prohibits the taking of property for *private* use." *Maher v. Lasater*, 163 Tex. 356, 354 S.W.2d 923, 924 (1962). In *Maher*, the Texas Supreme Court held:

> The provision operates as a limitation on the power of the Legislature as well as a limitation on the power of governmental agencies and public and private corporations. (citation omitted). The Legislature may not authorize that which the Constitution prohibits. . . .
>
> [A] mere declaration by the Legislature cannot change a private use or private purpose into a public use or public purpose. (citations omitted). While a legislative declaration in this and kindred fields will be given great weight by the courts, the ultimate question of whether a particular use is a public use is a judicial question to be decided by the courts.

*Id.* at 924–25. In construing the statute, we presume the Legislature intended to comply with the Constitution. *See* TEX. GOV'T CODE ANN. § 311.021(1) (Vernon 2005).

Consistent with the Texas Constitution, Chapter 111 of the Natural Resources Code is not applicable to pipelines used solely for private purpose. *See* TEX. NAT. RES.CODE ANN. § 111.003 (Vernon 2001). Section 111.003(a) states, "The provisions of this chapter do not apply to pipelines that are limited in their use to the wells, stations, plants, and refineries of the own-

er and that are not a part of the pipeline transportation system of a common carrier as defined in Section 111.002 of this code." *Id.* Section 111.002(6) defines a CO2 pipeline owner as a common carrier only if the owner, among other things, transports CO2 "to or for the public for hire[.]" TEX. NAT. RES.CODE ANN. § 111.002(6) (Vernon Supp. 2008).

Denbury argues that by agreeing to be regulated by the Commission it automatically became a common carrier. The Constitution does not authorize the taking of private property for regulated private use. TEX. CONST. art. I, § 17. The use must be a public one. *Id.*

Denbury argues further that it must now by law permit others to use its pipeline. Merely offering a transportation service for a profit does not distinguish a private use from a public use. Private carriers transport in particular instances for those they choose to contract with, and make individualized decisions whether and on what terms to transport. A common carrier is one involved in a quasi-public activity, and transportation is, in fact, available to all indifferently. Is the intent to make a pipeline running from a Denbury well to a Denbury well available for use by the "public for hire" reasonable? This summary judgment record is not entirely clear on that question.

We should not grant conclusive effect to Denbury's filings with the Railroad Commission. The Commission's letter simply states that Denbury has made the necessary filings to operate as a common carrier. Declaring a use public or private is a judicial decision. *See Maher*, 354 S.W.2d at 925. We must give great weight to the declarations of the Legislature and the Railroad Commission, but we should not assume either the Legislature or the Railroad Commission intended to authorize an unconstitutional private taking. We

should presume that a constitutional declaration was intended.

Summary judgments are used to dispose of "patently unmeritorious claims...." *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 n. 5 (Tex.1979). When there is only a question of law involved and no genuine issue of material fact exists, a conventional trial before a fact-finder may not be necessary. Here, however, genuine issues of material fact exist. We should reverse the summary judgment and remand the case for a trial at which the disputed facts can be determined by a fact-finder. If Denbury is successful at trial, then it can proceed with the exercise of eminent domain powers, and appellant should be enjoined from interfering. Otherwise, the Texas Constitution prohibits an attempt to take private property without the owner's consent. I respectfully dissent.