In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-14-00176-CV**
_____

**TEXAS RICE LAND PARTNERS, LTD., JAMES E. HOLLAND, DAVID C. HOLLAND, AND MIKE LATTA, Appellants**

**V.**

**DENBURY GREEN PIPELINE-TEXAS, LLC, Appellee**

**On Appeal from the 172nd District Court**
**Jefferson County, Texas**
**Trial Cause No. E-181,923**

**OPINION**

James E. Holland, David C. Holland, and Texas Rice Land Partners, Ltd. ("Texas Rice") own a Texas cattle ranch and rice farm. Mike Latta, a rice farmer, leases the property. Denbury Green Pipeline-Texas, LLC ("Denbury Green") sought to construct a carbon dioxide pipeline across the property. When Texas Rice refused to allow Denbury Green to survey the property, Denbury Green obtained a temporary injunction against Texas Rice. The trial court subsequently

1

granted Denbury Green's motion for summary judgment, finding that Denbury Green is a common carrier with the power of eminent domain. The trial court permanently enjoined Texas Rice from: (1) interfering or attempting to interfere with Denbury Green's right to enter and survey Texas Rice's property; and (2) harassing Denbury Green while it conducts its survey.

This Court affirmed the trial court's ruling, but the Texas Supreme Court developed a new test for determining common carrier status and reversed our decision on grounds that Denbury Green had not shown itself to be a common carrier under the new test. *Tex. Rice Land Partners, Ltd. v. Denbury Green Pipeline-Texas LLC*, 296 S.W.3d 877, 878 (Tex. App.—Beaumont 2009), *rev'd*, 363 S.W.3d 192 (Tex. 2012). On remand, Denbury Green again moved for summary judgment, alleging that it is a common carrier under the Texas Natural Resources Code and the Texas Business Organizations Code. The trial court granted Denbury Green's motion, declared that Denbury Green is a common carrier under both statutory provisions and has the right of eminent domain as to the carbon dioxide pipeline, and dismissed Texas Rice's counterclaims. In two appellate issues, Texas Rice challenges the trial court's summary judgment ruling and final judgment. We reverse the trial court's judgment and remand for further proceedings consistent with this opinion.

Factual Background

Ray Dubuisson, Denbury Green's vice-president of land, testified that Denbury Green was formed for the purpose of owning a Texas pipeline. According to Dan Cole, Denbury Green's vice-president of marketing and business development, Denbury Green is regulated as a common carrier by the Texas Railroad Commission and does not buy, sell, explore for, or produce carbon dioxide. He stated that the "Green Line" was proposed in 2008 as a pipeline to be "constructed, owned, and operated for the transportation of carbon dioxide from the Texas-Louisiana border, running west along the Gulf Coast, to the Oyster Bayou Unit in Chambers County, Texas, and on to the West Hastings Unit in Brazoria and Galveston Counties, Texas[.]" Denbury Onshore, LLC, with which Denbury Green is affiliated, owns the NEJD pipeline located in Mississippi and Louisiana and would own the Louisiana portion of the Green Line. Together, the Green Line and the NEJD pipeline would form a network to transport carbon dioxide from the Jackson Dome Unit in Mississippi and from other sources of anthropogenic carbon dioxide located along the Green Line's route.

Cole stated that Denbury Onshore and other third-party leaseholders own interests in the West Hastings Unit and the Oyster Bayou Unit. John Armor, a joint interest advisor for ExxonMobil, testified that Denbury Onshore's ownership

interest in the West Hastings Unit is about eighty-nine percent and ExxonMobil owns about 9.7 percent. Denbury Onshore also operates the Jackson Dome Unit, but Cole stated that the carbon dioxide reserves in the Jackson Dome are also utilized by other working interest owners. In April 2008, the Railroad Commission granted Denbury Green's permit to operate the Green Line, noting that Denbury Green had provided the filings necessary to be classified as a common carrier for transportation of carbon dioxide. Denbury Green completed the pipeline in 2010.

Cole explained that the Green Line is located near oil fields whose owners are potential shippers and that "it was intended from inception that the proposed Green Line would transport carbon dioxide for hire[.]" Dubuisson also acknowledged the possibility that "other's people's" carbon dioxide would be transported through the pipeline. According to Cole, Denbury Green anticipated "a strong demand for carbon dioxide pipelines to carry carbon dioxide waste away from plants and refineries to oil fields where tertiary recovery operations were being conducted." Cole stated that Denbury Green intended the Green Line to be used for not only transporting the carbon dioxide needed for tertiary operations in the West Hastings Unit and the Oyster Bayou Unit, but that the Green Line would also be used by other entities. Cole asserted that Denbury Green has (1) reserved space in the Green Line for other users; (2) always made the Green Line available

4

to carbon dioxide owners for shipping; and (3) anticipated that plants, refineries, and other industrial facilities along the Green Line's route are potential customers who may choose to use the Green Line for transport and pay Denbury Green for those transportation services. Additionally, Cole stated that Denbury Green transports, for a fee, carbon dioxide owned by Denbury Onshore and the other interest owners of the West Hastings Unit and the Oyster Bayou Unit. Cole believed Denbury Green would secure additional transportation agreements.

Cole also explained that Airgas Carbonic, Inc. approached Denbury Green in 2012 about using the Green Line to move its carbon dioxide from Airgas's facility in Mississippi to another Airgas facility to be constructed in Texas. Airgas's Texas facility would process liquid carbon dioxide for sale to its Houston-area customers. In 2013, the parties entered into a contract in which Denbury agreed to transport carbon dioxide from the Texas/Louisiana border to Airgas's Texas facility. Airgas maintains title to the carbon dioxide being shipped to its Texas facility. Phil Filer, Airgas's president, stated that Airgas manufactures and distributes liquid carbon dioxide and was using a Shell Refinery in Texas to convert gas into liquid. Filer explained that Airgas constructed its own liquid $CO_2$ manufacturing plant in Texas once the Shell Refinery became unavailable and that Airgas would not have

5

expended the resources needed to build its Texas facility if Airgas did not intend to use the Green Line for shipping.

Cole further stated that, in 2008, Denbury Green and Air Products, LLC began discussions regarding the use of the Green Line to transport anthropogenic carbon dioxide. In 2012, the parties entered into a contract whereby Denbury agreed to transport anthropogenic carbon dioxide to a meter in the West Hastings Unit. Cole explained that Air Products retains title to the carbon dioxide and that title is transferred at the West Hastings Unit. Gloria Power, the director of business development tonnage gases for Air Products, explained that, without the Green Line, it would not have been economically feasible for Air Products, a manufacturer and supplier of industrial gases, to participate in a capture and sequestration project with the United States Department of Energy. Power testified that the carbon dioxide transported to the West Hastings Unit is used by Denbury Onshore who pays Air Products for the carbon dioxide. She explained that once the carbon dioxide reaches the West Hastings Unit, it is initially used for enhanced oil recovery operations, but that all of the carbon dioxide is ultimately permanently sequestered underground in the West Hastings Unit when oil and gas operations are abandoned.

In its summary judgment, the trial court declared that Denbury Green is a common carrier under section 111.002(6) of the Texas Natural Resources Code and section 2.105 of the Texas Business Organizations Code. The Court found that, as a common carrier, Denbury Green has the power of eminent domain under section 111.019 of the Texas Natural Resources Code and the Green Line is a carbon dioxide common carrier pipeline that serves the public.

## Summary Judgment

In issue one, appellants contend that the trial court erred by granting summary judgment in favor of Denbury. We review a trial court's ruling on a traditional summary judgment motion *de novo*. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). We "consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all of the evidence presented." *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007) (per curiam). We view the evidence in the light most favorable to the nonmovant, indulge every reasonable inference in favor of the nonmovant, and resolve any doubts against the motion. *Id.* at 756.

According to Denbury Green, section 2.105 of the Texas Business Organizations Code "provides an *additional* source of condemnation authority beyond that provided in the Natural Resources Code." Section 2.105 provides, in

pertinent part, that a limited liability company engaged as a common carrier in the pipeline business for the purpose of transporting carbon dioxide has all the rights and powers conferred on a common carrier by sections 111.019 through 111.022 of the Texas Natural Resources Code. Tex. Bus. Org. Code Ann. § 2.105 (West 2012). Section 111.019 gives common carriers the power of eminent domain to enter and condemn the land, rights-of-way, easements, and property of any person or corporation necessary for the construction, maintenance, or operation of a common carrier pipeline. Tex. Nat. Res. Code Ann. § 111.019(a), (b) (West 2011). To exercise this right of eminent domain, an entity must meet the statute's definition of "common carrier." *Id.* § 111.002. A common carrier:

> owns, operates, or manages, wholly or partially, pipelines for the transportation of carbon dioxide or hydrogen in whatever form to or for the public for hire, but only if such person files with the commission a written acceptance of the provisions of this chapter expressly agreeing that, in consideration of the rights acquired, it becomes a common carrier subject to the duties and obligations conferred or imposed by this chapter[.]

*Id.* § 111.002(6). Thus, to have the right of eminent domain conferred by Chapter 111, as referenced in section 2.105, an entity must still meet Chapter 111's common carrier requirement. Accordingly, section 2.105 is not an independent basis for exercising eminent domain authority. *See R.R. Comm'n of Tex. v. Moran Utils. Co.*, 728 S.W.2d 764, 767 (Tex. 1987) ("A statute must be harmonized with

8

other relevant statutes, if possible."); *see also Howlett v. Tarrant Cnty.*, 301 S.W.3d 840, 846 (Tex. App.—Fort Worth 2009, pet. denied) ("If the statutes share a common purpose or object, they must be harmonized if possible.").

Under the Texas Supreme Court's new test for determining common carrier status pursuant to Chapter 111, "for a person *intending to build* a [carbon dioxide] pipeline to qualify as a common carrier under Section 111.002(6), a reasonable probability must exist that the pipeline will at some point after construction serve the public by transporting gas for one or more customers who will either retain ownership of their gas or sell it to parties other than the carrier." *Tex. Rice*, 363 S.W.3d at 202 (emphasis added). Thus, central to our inquiry is Denbury Green's intent at the time of its plan to construct the Green Line. *See id*. This is particularly true, given that Texas Rice challenged Denbury Green's common carrier status as early as mid-2008. ("[O]nce a landowner challenges [common carrier] status, the burden falls upon the pipeline company to establish its common-carrier bona fides if it wishes to exercise the power of eminent domain."). *Id.* "[A] reasonable probability is one that is more likely than not." *Id*. at 202 n.29.

Denbury Green presents several arguments in support of its contention that it is a common carrier under *Texas Rice*. According to Denbury Green, Airgas uses the Green Line to transport its own carbon dioxide to its own facility in Texas

9

where it uses the carbon dioxide for its own purposes and Airgas retains ownership of the carbon dioxide at all times. The record demonstrates that the Green Line was first contemplated in 2008, but Airgas did not approach Denbury Green about transporting carbon dioxide until after the Green Line was completed. Tellingly, when Airgas raised the issue in an email sent after the Texas Supreme Court's ruling, Airgas stated, "Given the recent ruling about your pipeline, I thought it might be advantageous for you to have another company transport some $CO_2$ down this line." As the Texas Supreme Court has noted, the professed use must be a public use in truth. *Id* at 202. We cannot say that the Airgas contract, reached after the Green Line's completion, speaks to Denbury Green's intent at the time of its plan to construct the Green Line. *See id.*

Denbury Green also contends that, because of the Green Line's location near oil fields, a reasonable probability exists that carbon dioxide emitters could capture carbon dioxide emissions and ship those emissions through the Green Line to non-Denbury Green purchasers, other mature oil fields for tertiary recovery, or other sequestration locations. According to Denbury Green, it intentionally placed the Green Line near potential shippers, it intended to transport carbon dioxide for hire, it anticipated a demand for pipelines to carry carbon dioxide waste, and it believed additional transportation contracts would be reached. However, "property is taken

10

for public use only when there results to the public some *definite* right or use in the business or undertaking to which the property is devoted." *Coastal States Gas Producing Co. v. Pate*, 309 S.W.2d 828, 833 (Tex. 1958) (emphasis added). Denbury Green's subjective beliefs about what it anticipated and who might use the Green Line are mere conclusions and are not competent summary judgment evidence. *See Tex. Division-Tranter v. Carrozza*, 876 S.W.2d 312, 314 (Tex. 1994). Such subjective beliefs do not demonstrate, as a matter of law, a reasonable probability that, at the time Denbury Green intended to build the Green Line, the pipeline's purpose was to serve the public. *See Texas Rice*, 363 S.W.3d at 202.

Additionally, Denbury Green asserts that, although the Green Line serves its affiliate Denbury Onshore, the Green Line also serves other West Hastings interest owners by transporting carbon dioxide from the Jackson Dome to the West Hastings Unit. Denbury Green contends that all of the interest owners, not just Denbury Onshore, use the carbon dioxide for enhanced oil recovery operations. Moreover, Denbury Green argues that the anthropogenic carbon dioxide captured by Air Products is shipped to the West Hastings Unit and sold to Denbury Onshore on behalf of both Denbury Onshore and the other West Hastings interest owners for use in tertiary operations in the West Hastings Unit. Denbury Green maintains that Denbury Onshore and the other West Hastings interest owners are only

11

incidental users of this carbon dioxide, given that sequestration is the ultimate end use.

Denbury Onshore does pay for and use the carbon dioxide that Air Products sends to the West Hastings Unit and it is not the only interest owner in either the Jackson Dome Unit or the West Hastings Unit. However, Denbury Onshore owns the majority interest in both the Jackson Dome Unit and the West Hastings Unit and is the operator of the West Hastings Unit, incurring the responsibility for day-to-day operations. Denbury Green's agreements with Denbury Onshore, as shipper and operator of the West Hastings Unit, to transport carbon dioxide for a fee was ratified by four non-operator working interest owners of the West Hastings Unit. Armor testified that ExxonMobil did not ratify these agreements; Denbury Onshore appeared to be purchasing carbon dioxide from itself; ExxonMobil does not have title to or possession of the carbon dioxide; and, ExxonMobil pays a 9.7 percent interest in transportation and production costs.

Given evidence indicating that (1) Denbury Onshore owns the controlling interest in the West Hastings Unit and the Jackson Dome Unit, (2) a very small percentage of non-operator working interest owners ratified the transportation agreements, and (3) the other interest owners do not take title to or possession of the carbon dioxide, reasonable jurors could differ as to whether Denbury Green's

contracts with Air Products and Denbury Onshore are sufficient to establish an intent to serve the public. Specifically, the evidence raises a fact issue regarding whether the taking serves a *substantial* public interest. *See Pate*, 309 S.W.2d at 833 (A taking of property for public use does not become a private use simply because a private entity benefits from the taking, as long as the "public has a direct, tangible and substantial interest and right in the undertaking."). The duty of weighing this evidence belongs to the jury. *See Huckabee v. Time Warner Entm't Co., L.P.*, 19 S.W.3d 413, 422 (Tex. 2000) ("[T]rial courts must not weigh the evidence at the summary judgment stage.").

"Issues of knowledge and intent are rarely appropriate for summary judgment." *Murray v. Cadle Co.*, 257 S.W.3d 291, 302 (Tex. App.—Dallas 2008, pet. denied). Only when reasonable minds cannot differ does the issue of intent become a question of law; otherwise, intent is a question of fact for the jury's determination. *Logan v. Mullis*, 686 S.W.2d 605, 608 (Tex. 1985). In this case, viewing the evidence in the light most favorable to appellants and indulging every inference in their favor, we conclude that reasonable minds could differ regarding whether, at the time Denbury Green intended to build the Green Line, a reasonable probability existed that the Green Line would serve the public. *See Tex. Rice*, 363 S.W.3d at 202; *see also Mayes*, 236 S.W.3d at 756; *Logan*, 686 S.W.2d at 608.

13

Accordingly, summary judgment was improper. We sustain issue one and need not address appellants' second issue.[1] *See* Tex. R. App. P. 47.1. We reverse the trial court's order granting summary judgment in favor of Denbury Green and remand the cause for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

_____
STEVE McKEITHEN
Chief Justice

Submitted on December 18, 2014
Opinion Delivered February 12, 2015

Before McKeithen, C.J., Kreger and Horton, JJ.

---

[1]In issue two, appellants maintain that a final judgment was granted on claims not presented in Denbury Green's summary judgment motion.