# IN THE SUPREME COURT OF TEXAS

══════════
No. 15-0225
══════════

DENBURY GREEN PIPELINE-TEXAS, LLC, PETITIONER,

v.

TEXAS RICE LAND PARTNERS, LTD., ET AL., RESPONDENTS

═══════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE NINTH DISTRICT OF TEXAS
═══════════════════════════════════════════════════

**Argued September 15, 2016**

JUSTICE GREEN delivered the opinion of the Court in which CHIEF JUSTICE HECHT, JUSTICE WILLETT, JUSTICE GUZMAN, JUSTICE LEHRMANN, JUSTICE BOYD, JUSTICE DEVINE, and JUSTICE BROWN joined.

JUSTICE JOHNSON joined in the judgment only.

We must decide whether Denbury Green Pipeline-Texas, LLC (Denbury Green) is a common carrier pursuant to the Texas Natural Resources Code and the test we set out in *Texas Rice Land Partners, Ltd. v. Denbury Green Pipeline-Texas, LLC* (*Texas Rice I*). 363 S.W.3d 192, 202 (Tex. 2012); TEX. NAT. RES. CODE § 111.019(a). Because Denbury Green's summary judgment evidence conclusively established a reasonable probability that, at some point after construction, the carbon dioxide pipeline known as "the Green Line" would serve the public, as it does currently, we hold that

Denbury Green is a common carrier as a matter of law. Accordingly, we reverse the judgment of the court of appeals and reinstate the trial court's judgment.

## I. Background and Procedural History

Denbury Green is an affiliate of Denbury Onshore, LLC, and both are wholly owned, indirect subsidiaries of Denbury Resources, a publicly traded holding company. James E. Holland, David C. Holland, and Texas Rice Land Partners, Ltd.[1] (collectively "Texas Rice") own approximately 3,800 acres of land in Jefferson County, Texas. The land is leased and used for rice farming.

According to the affidavit testimony of Dan Cole, Denbury Green's Vice President of Marketing and Business Development, Denbury Green was formed to build, own, and operate a carbon dioxide pipeline known as "the Green Line" as a common carrier in Texas. The Green Line became part of a pipeline network formed, at least in part, to transport carbon dioxide from Jackson, Mississippi (known as the "Jackson Dome" area), along with anthropogenic carbon dioxide (manmade $CO_2$) from naturally occurring sources and producers located along the Green Line's route. Cole stated that the Green Line's route through Texas was designed to be close to refineries, plants, and other facilities that could use the line as a means to transport $CO_2$.[2] In fact, the Green Line is the only pipeline currently available to those $CO_2$ refineries, plants, and other industrial facilities. According to Cole, Denbury Green chose the pipeline's specific location for its proximity to those industrial facilities, which could transport anthropogenic $CO_2$ to oil fields, underground

---

[1] Texas Rice Land Partners, Ltd. is a family limited partnership with David C. Holland as general partner and his three children as limited partners.

[2] The Green Line runs west along the Gulf Coast from the Texas/Louisiana border to the Oyster Bayou Field in Chambers County, Texas, and continues to the West Hastings Field in Brazoria and Galveston Counties, Texas.

2

storage reservoirs, or other locations where $CO_2$ could be used or stored. As a result, Cole testified, the Green Line has served a public use since its completion in 2010, and it is currently used to transport $CO_2$ owned by Denbury Green and its affiliates as well as $CO_2$ owned by unaffiliated entities.

Before the Green Line's construction began, Denbury Green sought permission from landowners across the proposed Gulf Coast route, including Texas Rice, to survey their property. In late 2007, Denbury Green attempted to survey two tracts of Texas Rice's land in Jefferson County but was denied access. Not long after, in early 2008, Denbury Green filed a T-4 permit application with the Texas Railroad Commission to obtain common-carrier status, which would give it eminent domain authority pursuant to the Natural Resources Code. *See* TEX. NAT. RES. CODE § 111.019(a) ("Common carriers have the right and power of eminent domain."). Shortly thereafter, the Railroad Commission granted Denbury Green a T-4 permit. Armed with the permit, Denbury Green filed suit against Texas Rice for an injunction allowing access to the Jefferson County tracts so that it could complete the pipeline survey. While the suit was pending, Denbury Green took possession of Texas Rice's property pursuant to section 21.021(a) of the Texas Property Code, which allows a condemnor to take possession even while the property owner challenges the condemnor's eminent domain authority. TEX. PROP. CODE § 21.021(a). Denbury Green then surveyed for and constructed the Green Line.

On cross-motions for summary judgment, the trial court found that Denbury Green was a common carrier with eminent domain authority pursuant to the Natural Resources Code. The court of appeals affirmed the trial court's judgment. *Tex. Rice Land Partners, Ltd. v. Denbury Green*

3

*Pipeline-Tex., LLC*, 296 S.W.3d 877, 881 (Tex. App.—Beaumont 2009), *rev'd*, 363 S.W.3d 192 (Tex. 2012). Texas Rice then appealed to this Court. *Texas Rice I*, 363 S.W.3d 192. We reversed and remanded the case to the trial court for proceedings consistent with the common-carrier test we established, affording Denbury Green the opportunity to produce "reasonable proof of a future customer, thus demonstrating that [the Green Line] will indeed transport to or for the public for hire and is not limited in [its] use to the wells, stations, plants, and refineries of the owner." *Id*. at 204.

On remand, Denbury Green adduced evidence not before this Court in *Texas Rice I* to support its assertion of common-carrier status. Denbury Green produced transportation agreements with unaffiliated entities Airgas Carbonic, Inc. and Air Products and Chemicals, Inc (Air Products). Additional evidence included a transportation agreement between Denbury Green and Denbury Onshore, acting on behalf of itself and other working-interest owners that are unaffiliated with Denbury Green or any of its affiliates.[3]

Airgas Carbonic, a wholly owned subsidiary of Airgas, Inc., manufactures and distributes liquid $CO_2$, commonly selling its $CO_2$ to customers in the industrial, medical, and food-processing industries. In 2012, Airgas Carbonic began looking for a method to ship its out-of-state $CO_2$ to the Houston area. Aware of the recently constructed Green Line, Airgas Carbonic approached Denbury Green and in January 2013 finalized a transportation agreement allowing Denbury Green to ship

---

[3] Because we hold that the summary judgment evidence, including evidence related to unaffiliated shipping agreements, establishes Denbury Green's common carrier status, *infra* at ___, we express no opinion on whether contracts between affiliated entities that may benefit unaffiliated working interest owners satisfy the *Texas Rice I* test.

4

$CO_2$, owned by Airgas Carbonic,[4] from the Texas/Louisiana border through the Green Line to Brazoria County, Texas, where it is received and processed in a new Airgas Carbonic manufacturing plant.[5] The $CO_2$ is ultimately sold to Airgas Carbonic customers in the Houston area. The new Airgas Carbonic plant began receiving and processing Airgas Carbonic's $CO_2$ delivered over the Green Line in October 2013.

Air Products specializes in the manufacture and supply of industrial gases. Air Products began negotiating with Denbury Green in 2008, in anticipation of the Green Line's construction. In 2010, the United States Department of Energy, through its Industrial Carbon Capture and Sequestration Program, selected Air Products to receive $285 million in funding for the development and operation of a system to capture and sequester $CO_2$ from Air Products's steam methane reformers located within the Valero Refinery in Port Arthur, Texas. By doing so, Air Products reduces the amount of $CO_2$ released into the atmosphere by the reformers. In order to remain economically viable, however, Air Products requires a $CO_2$ pipeline to transport the captured $CO_2$.

After finalizing its agreement with the Department of Energy, Air Products entered into a transportation agreement with Denbury Green. Under the agreement, Air Products first ships captured $CO_2$ over a lateral pipeline connecting the Valero Refinery and the Green Line. The $CO_2$ is then transported over the Green Line to the West Hastings Field in Brazoria County, Texas, where title and ownership of the $CO_2$ transfers to Denbury Green. Once there, Denbury Green first uses the $CO_2$ in its tertiary recovery operations, but the gas is ultimately sequestered underground once

---

[4] According to the transportation agreement, Airgas Carbonic retains title to the $CO_2$ shipped over the Green Line.

[5] The new plant liquefies and purifies $CO_2$ originating from an Airgas Carbonic plant in Star, Mississippi.

oil and gas operations are abandoned. According to Air Products, approximately 51.5 million cubic feet of $CO_2$ per day will be shipped over the Green Line and ultimately sequestered during the fifteen-year contract term.

Upon reviewing the evidence adduced on remand, the court of appeals concluded that "reasonable minds could differ regarding whether, at the time Denbury Green intended to build the Green Line, a reasonable probability existed that the Green Line would serve the public" and reversed the trial court's order granting Denbury Green summary judgment. 457 S.W.3d 115, 121–22 (Tex. App.—Beaumont 2015, pet. granted).

## II. *Texas Rice I*

To comport with the Texas Constitution, we held in *Texas Rice I* that "[t]o qualify as a common carrier with the power of eminent domain, the pipeline must serve the public; it cannot be built only for the builder's exclusive use." 363 S.W.3d at 200. Specifically,

> for a person intending to build a $CO_2$ pipeline to qualify as a common carrier under Section 111.002(6) [of the Natural Resources Code], a reasonable probability must exist that the pipeline will at some point after construction serve the public by transporting gas for one or more customers who will either retain ownership of their gas or sell it to parties other than the carrier.

*Id*. at 202 (footnotes omitted). For purposes of this test, "a reasonable probability is one that is more likely than not." *Id.* at 202 n.29. Additionally, once a landowner challenges common-carrier status, "the burden falls upon the pipeline company to establish its common-carrier bona fides if it wishes to exercise the power of eminent domain." *Id*. at 202.

Under this constitutional framework, we held that Denbury Green was "not entitled to common-carrier status simply because it obtained a common-carrier permit, filed a tariff, and agreed

6

to make the pipeline available to any third party wishing to transport its gas in the pipeline and willing to pay the tariff." *Id*. Affidavit testimony in *Texas Rice I* supported that Denbury Green was negotiating with parties to transport $CO_2$ over the Green Line, but the testimony did not indicate whether the gas would be used solely by Denbury Green or for the benefit of other parties. *Id*. at 203. Additionally, record evidence supported only the possibility of future customers using the Green Line, but the record was devoid of any identified potential customers. *Id*. Moreover, the record included objective evidence of Denbury Green's intent to use the pipeline solely for its own purposes. *Id.* Several statements on Denbury Green's website suggested that Denbury Green's intended use for the pipeline actually related to the eventual purchase and acquisition of all naturally occurring $CO_2$ in the region in an effort to fully harness the Green Line for Denbury Green's own tertiary recovery operations. *Id*. at 203–04.

Thus, the evidence before the Court in *Texas Rice I* established only a possibility, and not a reasonable probability, that the pipeline "at some point after construction" would serve the public. *Cf*. *State v. K.E.W.*, 315 S.W.3d 16, 23 (Tex. 2010) (recognizing that "probability" is synonymous with "likelihood"). Because "[a] sine qua non of lawful taking . . . for or on account of public use . . . is that the professed use be a public one in truth," we held that Denbury Green's mere assertions of the possibility of public use were insufficient to conclude that Denbury Green was a common carrier. *Texas Rice I*, 363 S.W.3d at 202 (quoting *Hous. Auth. of City of Dallas v. Higginbotham*, 143 S.W.2d 79, 84 (Tex. 1940)). We remanded the case to the trial court for further proceedings, concluding that once a pipeline's common-carrier status has been challenged, "the company must present reasonable proof of a future customer, thus demonstrating that the pipeline will indeed

7

transport 'to or for the public for hire' and is not 'limited in [its] use to the wells, stations, plants, and refineries of the owner.'" *Id*. at 204 (quoting TEX. NAT. RES. CODE §§ 111.002(a), .003(a) (alteration in original)). In this appeal, the parties dispute whether Denbury Green's new evidence adduced on remand entitles it to summary judgment on the issue of whether it is a common carrier. Because "the right to condemn property is constitutionally limited and turns in part on whether the use of the property is public or private," we recognize that "the ultimate question of whether a particular use is a public use is a judicial question to be decided by the courts." *Id.* at 198 (quoting *Maher v. Lasater*, 354 S.W.2d 923, 925 (Tex. 1962)). We are again called upon to apply the test we announced in *Texas Rice I* to the facts of this case, considering whether Denbury Green established as a matter of law a reasonable probability that, at some point after construction, the Green Line would serve the public by transporting gas for one or more customers who will either retain ownership of their gas or sell it to parties other than the carrier. We hold that Denbury Green satisfied the test established in *Texas Rice I* and is a common carrier pursuant to Chapter 111 of the Natural Resources Code.[6]

### III. Application of *Texas Rice I* Test

We review a grant of summary judgment de novo. *SeaBright Ins. Co. v. Lopez*, 465 S.W.3d 637, 641 (Tex. 2015). The movant must prove that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We review summary judgment

---

[6] In its briefing, Denbury Green asks that we determine whether section 2.105 of the Business Organizations Code provides an independent grant of eminent domain authority for a common carrier. *See* TEX. BUS. ORGS. CODE § 2.105. Because we hold that Denbury Green is a common carrier under Chapter 111 of the Natural Resources Code, we need not decide this question.

evidence "in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Mann Frankfort*, 289 S.W.3d at 848 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)).

## A. The Court of Appeals' Interpretation of Intent as Central to the *Texas Rice I* Test

The court of appeals incorrectly interpreted the prefatory phrase "for a person intending to build" that introduced the *Texas Rice I* test when it held that "central to our inquiry is Denbury Green's intent at the time of its plan to construct the Green Line." 457 S.W.3d at 120. Reliance on this phrase to focus on intent is improper because "person intending to build" does not describe the requisite intent of a party at the time the pipeline was contemplated. Rather, the prefatory phrase demonstrates who must prove common-carrier status—the pipeline company. Focusing on intent, the court of appeals disregarded relevant evidence submitted by Denbury Green that Airgas Carbonic had entered into a contract to transport its $CO_2$ over the Green Line, noting that the contract was entered into after the pipeline's construction. *Id*. Additionally, the court of appeals rejected relevant evidence that the Green Line's future public use could be supported by its proximity to other $CO_2$ shippers once construction was completed. *Id*. As a result, by shifting the analysis to one focused on intent, the court of appeals ultimately ignored relevant evidence supporting Denbury Green's common-carrier status.

In *Texas Rice I*, our review of the evidence was necessarily limited to Denbury Green's assertions that it intended the Green Line to be used by the public, but our determination that Denbury Green was not entitled to summary judgment rested on the absence of evidence establishing

9

a reasonable probability of the Green Line's future public use. *Texas Rice I*, 363 S.W.3d at 204.

Standing alone, evidence of Denbury Green's intent did not meet *Texas Rice I*'s reasonable probability standard—at most, it suggested only a mere possibility of future public use. *See id*. at 203–04. In reviewing affidavit testimony supporting Denbury Green's assertion that it was negotiating with other parties to transport $CO_2$ over the Green Line, we determined that the evidence failed to establish public use because, absent contrary evidence, the testimony suggested that Denbury Green would transport gas only for its own tertiary recovery operations. *Id.* at 203. The testimony "did not identify any possible customers and [Denbury Green] was unaware of any other entity unaffiliated with Denbury Green that owned $CO_2$ near the pipeline route in Louisiana and Mississippi." *Id*. Addressing Denbury Green's claims on its website, we concluded:

> Denbury Green's representations suggesting that it (1) owns most or all of the naturally occurring $CO_2$ in the region, (2) intends to purchase all the man-made $CO_2$ that might be produced under current and future agreements, (3) see its access to $CO_2$ as giving it a significant advantage over its competitors, and (4) intends to fully utilize the pipeline for its own purposes, *are all inconsistent with public use of the pipeline*.

*Id*. at 204 (emphasis added). We therefore held that Denbury Green failed to establish a reasonable probability that, "at some point after construction," the Green Line would serve the public. *Id*.

The objective *Texas Rice I* test balances the property rights of Texas landowners with our state's robust public policy interest in pipeline development, while also respecting the constitutional limitations placed on the oil and gas industry. *See id*. at 197, 204. Prior to *Texas Rice I*, a pipeline owner needed to do little more than "check[] a certain box on a one-page government form" to obtain common-carrier status. *Id.* at 199. Essentially, a pipeline owner only needed to assert that

10

it was a common carrier, and it became one. However, "[o]ur Constitution demands far more." *Id.* To protect the rights of property owners, the Texas Constitution requires at least some objective evidence that a pipeline will probably serve the public for its owner to gain the power to condemn private property under the authority of eminent domain. *Id.* at 202. Contracts with unaffiliated entities that show non-pipeline-owned gas being transported for the benefit of the unaffiliated entity can be relevant to showing reasonable probability of future public use.

Texas Rice would have this Court hold that because the Airgas Carbonic contract was entered into after the Green Line was contemplated—and even after this Court's holding in *Texas Rice I*—it is irrelevant and, at most, raises a fact issue as to whether Denbury Green intended to make the pipeline available to the public. Simply put, this reading misunderstands the *Texas Rice I* test and the reasoning behind it.

At oral argument, both parties expressed their belief that evidence of post-construction contracts is relevant to the common-carrier analysis. We agree. While post-construction contracts considered without any other relevant evidence would normally establish only a pre-construction possibility of future public use, such contracts can be relevant to showing a reasonable probability that, "at some point after construction," a pipeline will serve the public. For example, such contracts can speak directly to whether specific, identified potential customers own $CO_2$ near a pipeline's route, as in this case. Moreover, when combined with other evidence, post-construction contracts could allow a reasonable observer to determine that, given the regulatory atmosphere and proximity of the pipeline to potential customers, at the time common-carrier status was challenged it was "more likely than not" that a pipeline would someday serve the public.

11

When considered in the light most favorable to Texas Rice, indulging every reasonable inference in its favor, Denbury Green conclusively established that there was a reasonable probability that, at some point after construction, the Green Line would serve the public. With evidence that Denbury Green entered into a contract in 2013 to transport $CO_2$ for Airgas Carbonic, along with the proximity of the Green Line to potential customers such as Airgas Carbonic and Air Products, no longer could a reasonable fact-finder determine that a genuine fact issue exists as to whether the Green Line would, *at some point after construction*, do what it now most certainly does: transport $CO_2$ owned by a customer who retains ownership of the gas. The Airgas Carbonic contract does more than show that it is "more likely than not" that the Green Line will *someday* be used for public use; it shows that the Green Line is used for public use *today*. Most importantly, the Air Products transportation agreement supports Denbury Green's contention that the pipeline route was designed in part to facilitate the transfer of gas owned by third parties. According to Air Products, "[w]ithout the Denbury Green Pipeline, the Air Products $CO_2$ capture program would not have been economical and would not have been undertaken." The proposed Green Line was not only within geographic proximity to Air Products's reformers in the Valero Refinery, but it was the only pipeline close enough to transport Air Products's $CO_2$. The close proximity, and lack of competing pipelines, caused Air Products to begin negotiating with Denbury Green in 2008, before the pipeline was constructed. It is true that the Air Products contract, standing alone, would not satisfy the *Texas Rice I* test because title to the $CO_2$ transfers to Denbury Green at the end of its transport. *Id.* ("If Denbury consumes all the pipeline product for itself, it is not transporting gas 'to . . . the public for hire.'"). However, when considered together with the Green Line's proximity to identified potential

12

customers, including Air Products, and the Airgas Carbonic transportation contract, under which Airgas Carbonic retains title to the $CO_2$, the summary judgment evidence conclusively establishes that it was "more likely than not" that, "at some point after construction," the Green Line would serve the public.

### B. The Court of Appeals' Requirement of a Substantial Public Interest

The court of appeals erroneously required that the reasonably probable future use of the pipeline serve a "substantial public interest." 457 S.W.3d at 121. The court of appeals discounted Denbury Green's claim that small interest owners in the West Hastings and Jackson Dome fields benefitted from $CO_2$ transferred from those units over the Green Line even though Denbury Onshore owned the controlling interests in both units, concluding that it raised a fact issue of whether such use was substantial. *Id*. Additionally, the court of appeals determined that the Air Products agreement, under which Air Products would transfer ownership of its $CO_2$ to Denbury Green even though Denbury Green was required to sequester the gas in a method that complied with Air Products's agreement with the federal government, was not sufficiently "substantial" to survive summary judgment. *Id.* In imposing this additional requirement, the court of appeals erroneously relied on this Court's 1958 decision in *Coastal States Gas Producing Co. v. Pate*. *Id*. (citing 309 S.W.2d 828, 833 (Tex. 1958)).

In *Pate*, Coastal States Gas Producing Co. attempted to condemn a 1.84-acre tract to further develop an oil and gas lease. *Pate*, 309 S.W.2d at 830. In deciding that Coastal States had eminent domain authority to drill a directional well, we determined that the state's benefit—one-fourth of the gross production revenue dedicated to the Permanent School Fund—was a "direct, tangible and

13

substantial interest" in the taking. *Id*. at 833. We did not hold that the interest need be direct, tangible, or substantial, but rather that the facts before us in *Pate* supported that the public's interest would be served. *Id*. To the extent that the degree of service to the public was woven into our test in *Texas Rice I*, we held that for the pipeline to serve the public it must "transport[] gas for *one or more* customers who will either retain ownership of their gas or sell it to parties other than the carrier." 363 S.W.3d at 202 (emphasis added) (footnote omitted). Existential arguments related to the power and importance of the individual notwithstanding, we hold that evidence establishing a reasonable probability that the pipeline will, at some point after construction, serve even one customer unaffiliated with the pipeline owner is substantial enough to satisfy public use under the *Texas Rice I* test.

## IV. Conclusion

After remand, the evidence in the summary judgment record before the trial court below was no longer limited to naked assertions or Denbury Green's subjective beliefs, as it was when we considered *Texas Rice I*. We hold that the evidence adduced by Denbury Green on remand established as a matter of law that there was a reasonable probability that, at some point after construction, the Green Line would serve the public by transporting $CO_2$ for one or more customers who will either retain ownership of their gas or sell it to parties other than the carrier. Accordingly, we reverse the court of appeals' judgment and reinstate the trial court's judgment.[7]

---

[7] Texas Rice alleges that the trial court erred by entering final judgment on its remaining declaratory judgment counterclaims and Denbury Green's declaratory judgment claims added after the trial court granted summary judgment on common-carrier status, without a trial or hearing additional evidence. In its April 4, 2014, hearing on the matter, the trial court denied Texas Rice's motion to sever its counterclaims, granted leave for Denbury Green to amend its petition, and entered final judgment. Because Denbury Green's amended claims raised no additional issues and could not result in any injury to Texas Rice, we hold that the trial court did not abuse its discretion when allowing Denbury Green to add

14

_____
Paul W. Green
Justice

**OPINION DELIVERED:** January 6, 2017

---

declaratory judgment claims prior to entry of final judgment. *See Victory v. State*, 158 S.W.2d 760, 763 (Tex. 1942). Finally, because Texas Rice's claims for relief relied upon the trial court finding Denbury Green was not a common carrier, we hold that the trial court properly entered final judgment. *See Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 200 (Tex. 2001) ("A judgment that actually disposes of every remaining issue in a case is not interlocutory merely because it recites that it is partial or refers to only some of the parties or claims.").