**Opinion issued March 27, 2025**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-23-00243-CV

———————————

**T.B. FARMS, LTD., Appellant**

**V.**

**GRAND PRIX PIPELINE, LLC, Appellee**

---

**On Appeal from the 278th District Court**
**Madison County, Texas**
**Trial Court Case No. 18-15085**

---

## MEMORANDUM OPINION

This is a condemnation case in which a landowner challenges the right of a

pipeline company to condemn an easement running across the landowner's land in

Madison County, Texas pursuant to statutory "common carrier" condemnation rights.[1]  *See* TEX. NAT. RES. CODE § 111.002.  We affirm.

## I.  Background

An overview of the law governing common-carrier pipelines and their powers of eminent domain is useful in understanding the background to this case.  Accordingly, we begin with an overview of the applicable law, followed by a summary of the facts specific to this case.

## A.  Common-carrier pipelines

"[T]he Legislature grants common carriers the right to condemn private property for the construction of pipelines that transport certain products.  The Texas Constitution, however, limits the exercise of this eminent domain power to purposes that serve a 'public use.'"  *Hlavinka v. HSC Pipeline P'ship, LLC*, 650 S.W.3d 483, 487 & n.2 (Tex. 2022) (citing TEX. CONST. art. I, § 17(a)–(b)).  "Public use" is thus a "constitutional requirement that a pipeline common carrier must fulfill to exercise eminent-domain authority."  *Id.* at 494.

Under the Natural Resources Code, a person qualifies as a common carrier if it "owns, operates, or manages a pipeline or any part of a pipeline in the State of

---

[1]  Pursuant to its docket-equalization authority, the Supreme Court of Texas transferred this appeal from the Tenth Court of Appeals to this Court.  *See* Misc. Docket No. 23-9017 (Tex. Mar. 21, 2023); *see also* TEX. GOV'T CODE § 73.001(a) (authorizing transfer of cases).  We are unaware of any conflict between the precedent of that court and of this Court on any relevant issue.  *See* TEX. R. APP. P. 41.3.

Texas for the transportation of crude petroleum to or for the public for hire, or engages in the business of transporting crude petroleum by pipeline." TEX. NAT. RES. CODE § 111.002(1). Natural gas liquids ("NGLs")—the materials being transported through the pipeline at issue here—"are liquid hydrocarbons that fall under the umbrella of crude petroleum." *Hlavinka*, 650 S.W.3d at 493 n.29.

If an entity qualifies as a common carrier, it has the power of eminent domain to condemn private property for the construction of a pipeline. "The Legislature has cultivated two sources of condemnation authority for pipelines, one in Business Organizations Code Section 2.105, and the other in Natural Resources Code Chapter 111." *Id*. at 491. These statutes "provide alternative paths" under which a common carrier obtains the power of eminent domain. *Id*. at 492.

Under the Natural Resources Code, "[c]ommon carriers have the right and power of eminent domain," including the right to "enter on and condemn the land, rights-of-way, easements, and property of any person or corporation necessary for the construction, maintenance, or operation of the common carrier pipeline." TEX. NAT. RES. CODE § 111.019(a)–(b). Under the Business Organizations Code, an entity "engaged as a common carrier in the pipeline business for the purpose of transporting oil, oil products, gas, . . . liquefied minerals, or other mineral solutions has all the rights and powers conferred on a common carrier by Sections 111.019–111.022, Natural Resources Code." TEX. BUS. ORG. CODE § 2.105.

Like all condemning authorities, common-carrier pipelines must follow the procedures set out in Chapter 21 of the Texas Property Code to condemn property. *See* TEX. PROP. CODE § 21.011; *Amason v. Nat. Gas Pipeline Co.*, 682 S.W.2d 240, 242 (Tex. 1984). Chapter 21 establishes a "two-part procedure involving, first, an administrative proceeding, and then if necessary, a judicial proceeding." *Id.* at 241. In the administrative phase, the condemning authority is required to make various disclosures and then to make a bona-fide offer to the landowner to acquire the property voluntarily. *See* TEX. PROP. CODE §§ 21.0111–.0113.

If the condemnor and the landowner cannot agree on damages for a voluntary taking, the condemnor must file a condemnation petition in the appropriate court. *See id*. §§ 21.012–.013. The trial court then appoints three disinterested real-property owners who reside in the county as special commissioners, and the special commissioners conduct hearings, assess damages, and file an award reflecting their opinion of the value of the land to be taken. *See id*. §§ 21.014–.016. If satisfied with the special commissioners' award, the condemnor can pay the amount to the landowner or deposit that amount into the registry of the court. *See id*. § 21.021(a).

Any party to the condemnation proceedings can object to the special commissioners' award by filing a written objection in the trial court. *See id*. § 21.018(a). Filing a timely objection vacates the special commissioners' award

4

and converts the administrative proceeding into a judicial one, with the condemnor as plaintiff and the landowner as defendant. *Amason*, 682 S.W.2d at 242. In that event, the trial court must "cite the adverse party and try the case in the same manner as other civil causes." TEX. PROP. CODE § 21.018(b).

During this judicial phase of the condemnation proceedings, "the condemnor may take possession of the condemned property pending the results of further litigation if the condemnor": (1) pays the landowner the amount awarded by the special commissioners or deposits that amount into the registry of the court; (2) deposits a surety bond into the registry of the court to cover any damages that may be awarded by the court in excess of the amount awarded by the special commissioners; and (3) executes a bond to cover any additional costs that may be awarded to the landowner. *Id.* § 21.021(a).

## B.    The Grand Prix pipeline

The pipeline at the center of this case is the Grand Prix pipeline ("the Pipeline"). It is an approximately 720-mile pipeline that transports NGLs across the state, from the Permian Basin area of west Texas to Mont Belvieu.

The Pipeline was originally owned and operated by Targa NGL Pipeline Company, LLC ("Targa NGL"), an affiliate of Targa Resources Corp. Targa NGL applied for and received the necessary permits from the Texas Railroad Commission for construction and operation of the pipeline, including a T-4 permit

classifying the pipeline as a common carrier.[2]  With the Railroad Commission's approval, Targa NGL later transferred all of the Pipeline's mileage to another Targa affiliate, Targa Downstream LLC, as the operator of the pipeline, and to Appellee Grand Prix Pipeline, LLC ("Grand Prix") as the owner and economic operator of the pipeline.  Grand Prix is a joint venture between Targa Resources and Blackstone Energy Partners.  Targa Downstream constructed the pipeline and now runs its day-to-day operations, and Grand Prix is the owner of the pipeline.

Grand Prix filed tariffs with both the Railroad Commission and the Federal Energy Regulatory Commission setting forth the rules and regulations under which it would accept product for transport through the Pipeline.  Both tariffs state that "[b]y nominating Product, the Shipper warrants and guarantees that the Shipper has good title to all Product tendered and delivered hereunder and agrees to hold Carrier harmless for any and all loss, cost, liability, damage and/or expense resulting from failure of title thereto."  Grand Prix also has reserved five percent of the Pipeline's capacity for unaffiliated "walk up" shippers seeking to transport permissible NGLs under the terms and conditions of its tariffs.

---

[2]     A T-4 permit is a document issued by the Railroad Commission that generally allows pipeline operators to install and operate intrastate pipelines in Texas.  *See* 16 TEX. ADMIN. CODE § 3.70(a).  Upon issuance, it reflects the pipeline operator's requested classification as a common-carrier line, a private line, or a gas-utility line.  *See id*. § 3.70(b)(2).  Applications for a T-4 permit must be supported by "a sworn statement from the pipeline applicant providing the operator's factual basis supporting the classification."  *Id*. § 3.70(b)(3).

Prior to construction, Grand Prix's board of directors determined the Pipeline would be used to provide common-carrier service to the public, and it formally resolved to operate the Pipeline as a common carrier. Before the Pipeline was completed, Grand Prix entered into at least one contract with third-party entity ELTM, L.P. ("ELTM"), under which the Pipeline would be used to transport NGLs owned by ELTM to Mont Belvieu. This transportation-services agreement states that "[t]itle to the Product tendered by [ELTM] to [Grand Prix] for transportation on the Pipeline will remain with [ELTM] as provided in the Tariff." The pipeline is also used to transport materials owned by Targa, Grand Prix's affiliate and joint-venture partner.

## C.    These condemnation proceedings

After obtaining the permits and securing a customer, Grand Prix filed dozens of condemnation actions along the Pipeline's path, with many landowners voluntarily agreeing to payment for a pipeline easement across their property.

Appellant T.B. Farms, Ltd. ("T.B. Farms") owns a tract of land in Madison County through which the Pipeline would run. Grand Prix filed this condemnation action against T.B. Farms to obtain a permanent pipeline easement across its property. The easement would be 50 feet wide and consist of 0.71 acres.

The trial court appointed three local landowners to serve as special commissioners. *See* TEX. PROP. CODE §§ 21.014–.016. After a hearing, the special

7

commissioners determined the value of the easement to be $5,588. Grand Prix deposited that amount into the trial court's registry, filed surety and cost bonds, and took possession of the easement. *See id*. § 21.021(a).

T.B. Farms objected to the special commissioners' award, thus invoking its right to a judicial proceeding. *See id*. § 21.018(b). T.B. Farms argued Grand Prix was without condemnation authority because it "does not own a pipeline, does not operate a pipeline, and has not applied to the Railroad Commission for authority to operate a pipeline in Texas." It also claimed that Grand Prix is owned by "high-ranking executives with Targa Resources Corp. and Targa Resources GP, LLC who have organized [Grand Prix] for the purpose of improving the personal profits of Targa Resources Corp. and Targa Resources GP, LLC."

T.B. Farms next filed a series of pleadings and motions in the trial court aimed at challenging Grand Prix's status as a common carrier and asserting counterclaims, including for trespass and alter ego. T.B. Farms also named several entities with which Grand Prix had business dealings as third-party defendants, alleging they had conspired to transport product "for private, not public[,] purposes" and to "circumvent Article 111.003 of the Texas Natural Resources Code." Grand Prix filed pleas to the jurisdiction as to the third-party claims. The trial court granted the pleas to the jurisdiction, dismissing all of T.B. Farms' third-party claims.

Grand Prix moved for partial summary judgment on the issue of its status as a common carrier with the power of eminent domain. Grand Prix explained it had contracted with an unaffiliated third-party, ELTM, to transport NGLs owned by ELTM through the pipeline. Grand Prix attached a copy of its transportation-services agreement with ELTM. The trial court granted the motion, stating in its written order that "Grand Prix is a common carrier vested by law with the right and power of eminent domain." T.B. Farms moved for reconsideration, which the trial court denied.

Grand Prix also moved for partial summary judgment on T.B. Farms' counterclaims. The trial court granted that motion, disposing of T.B. Farms' counterclaims. With T.B. Farms' counterclaims and third-party claims now dismissed, and the trial court's determination that Grand Prix had the power of eminent domain, the only issue that remained for trial was valuation of the easement. The trial court initially set the case for a trial on valuation in March 2022. But a tornado touched down in Madison County a few days before the scheduled trial date, so the trial court reset it for November 2022.

In August 2022—four years after the litigation began, five months after the original trial date, and three months before the new trial date—T.B. Farms amended its answer and again re-asserted many of the counterclaims and third-party claims on which the trial court had already granted summary judgment

or dismissal and added a counterclaim for "abuse of the condemnation process," supported by new surveys prepared by an undisclosed surveying expert.

Bruce Gaylor, Jr., as trustee of the Bruce Gaylor, Jr. Trust, and James Baker Gaylor, as Trustee of the James Baker Gaylor Trust (collectively, "Intervenors"), intervened to claim that the trusts own a one-acre "out parcel" within the T.B. Farms parcel, upon which a house is located. These two persons are the sons of Bruce Gaylor, T.B. Farms' principal. Intervenors alleged the Pipeline was intentionally routed near the house, which they characterized as "an abuse of the condemnation process for which Intervenors seek damages." In support of this assertion, the Intervenors also relied on the new surveys.

T.B. Farms filed a motion to modify the discovery period to allow for production of the surveys and designation of new experts, including the surveyor.

In response, Grand Prix filed another plea to the jurisdiction. The trial court granted the plea and dismissed T.B. Farms' third-party claims, as well as Intervenors' claims. In its order, the trial court stated that "the sole issue to be resolved at the trial in this matter is the valuation of TB Farms' property that was condemned by Grand Prix, and the damages to the remainder of the TB Farms' property, if any. TB Farms may not present at trial any arguments, testimony, witnesses, or evidence on any of its allegations previously rejected by this Court

10

(i.e. lack of common carrier status, trespass, specific need, and/or abuse of the condemnation process)."

After more than four years of pretrial proceedings, the case was tried to a jury in November 2022. Grand Prix presented expert testimony that valued the easement at $5,588. T.B. Farms' counsel asked no questions of Grand Prix's valuation expert on cross-examination. T.B. Farms then made a bill of exceptions consisting of evidence related primarily to its alter-ego and abuse-of-condemnation-process arguments. T.B. Farms did not present any evidence on valuation. Accordingly, the trial court dismissed the jury and directed a verdict, awarding T.B. Farms $5,588—the same amount initially awarded by the special commissioners four years prior. The trial court entered a final judgment granting the easement to Grand Prix and awarding $5,588 to T.B. Farms. T.B. Farms filed an original and then an amended motion for new trial, which the trial court denied. T.B. Farms now appeals.

## II.    Analysis

T.B. Farms raises four issues on appeal. First, T.B. Farms contends the trial court erred by granting partial summary judgment on the question of Grand Prix's status as a common carrier, thus preventing T.B. Farms from presenting its "alter ego" theory to the jury, because the evidence submitted during the bill of exceptions creates fact issues that preclude summary judgment. Second, T.B.

Farms argues the trial court erred by dismissing its counterclaims and third-party claims based on Grand Prix's plea to the jurisdiction. Third, T.B. Farms claims the trial court erred in ordering that the sole issue to be resolved at trial was the valuation of the easement. Fourth, T.B. Farms claims the trial court erred in dismissing the Intervenors' claims, notwithstanding that Intervenors did not file a notice of appeal. We address these issues in turn.

**A.**  **The trial court did not err in granting summary judgment on the issue of Grand Prix's status as a common carrier**

In its first and third issues, T.B. Farms challenges the trial court's summary judgment that Grand Prix is a common carrier with the power of eminent domain. T.B. Farms contends this ruling was erroneous because it improperly deprived T.B. Farms of the opportunity to present to the jury its evidence that Grand Prix is the "alter ego" of Targa Resources, and that the pipeline is used for the purpose of transporting product to which Targa retains title. T.B. Farms contends Grand Prix and Targa are, for all practical purposes, the same entity with common ownership, and Targa and its affiliates are using the pipeline to ship their own product, such that Grand Prix cannot satisfy the "public use" requirement for qualification as a common carrier. According to T.B. Farms, Grand Prix's status as Targa's alter ego, and thus its qualification as a common carrier, are "factual evidence matter[s]" that should have been decided by the jury.

12

### 1. Standard of review

We review a trial court's grant of summary judgment de novo. *Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 84 (Tex. 2018). To the extent our analysis includes issues of statutory interpretation, we also review those issues de novo. *Silguero v. CSL Plasma, Inc.*, 579 S.W.3d 53, 59 (Tex. 2019).

The purpose of summary-judgment practice is to "provide a method of summarily terminating a case when it clearly appears that only a question of law is involved and that there is no genuine issue of material fact." *G & H Towing Co. v. Magee*, 347 S.W.3d 293, 296–97 (Tex. 2011) (internal citations omitted). The movant has the burden of establishing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995). In deciding whether an issue of material fact precludes summary judgment, we take evidence favorable to the non-movant as true. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985). We make every reasonable inference, and resolve any doubts, in the non-movant's favor. *Id.* at 549.

### 2. T.B. Farms has not established that the trial court improperly granted summary judgment on the common-carrier issue

Again, a person qualifies as a common carrier if it "owns, operates, or manages a pipeline or any part of a pipeline in the State of Texas for the transportation of crude petroleum to or for the public for hire, or engages in the

13

business of transporting crude petroleum by pipeline." TEX. NAT. RES. CODE § 111.002(1). The Supreme Court has "reiterated through the decades that 'the ultimate question of whether a particular use is a public use is a judicial question to be decided by the courts.'" *Hlavinka*, 650 S.W.3d at 495 (quoting *Maher v. Lasater*, 354 S.W.2d 923, 925 (Tex. 1962)). Allowing juries to determine whether a pipeline is put to public use "would inject substantial uncertainty into multi-parcel infrastructure development, risking inconsistent adjudications among multiple triers of fact." *Id.*; *Denbury Green Pipeline-Tex., LLC v. Tex. Rice Land Partners, Ltd.*, 510 S.W.3d 909, 914 (Tex. 2017) ("*Tex. Rice II*") (affirming summary judgment that pipeline company was a common carrier).

T.B. Farms' summary-judgment evidence established that it owns the Pipeline, which is in Texas, and that NGLs, the materials being transported through the pipeline, fall within the meaning of "crude petroleum" as used in section 111.002(1). *See Hlavinka*, 650 S.W.3d at 493 n.29 ("Natural gas liquids are liquid hydrocarbons that fall under the umbrella of crude petroleum.").

The evidence also established that the Pipeline is available "to or for the public for hire." TEX. NAT. RES. CODE § 111.002(1). "[A] pipeline serves a public use as a matter of law if it is reasonably probable that, in the future, the pipeline will 'serve even one customer unaffiliated with the pipeline owner.'" *Hlavinka*, 650 S.W.3d at 494 (quoting *Tex. Rice II*, 510 S.W.3d at 917). Grand Prix

14

presented its contract with ELTM to transport ELTM's NGLs through the pipeline. ELTM is not affiliated with Grand Prix, and the contract states that ELTM would always retain title to the product. In addition, Grand Prix has filed a tariff with the Railroad Commission demonstrating that it offers its pipeline for public hire, and that title to the product would remain with any such customers. Therefore, Grand Prix satisfied the test for public use because its summary-judgment evidence established that the pipeline will serve at least "one customer unaffiliated with the pipeline owner." *Id.*

T.B. Farms makes two contentions to the contrary. The first is that Grand Prix is Targa's "alter ego." The gist of this argument is that Grand Prix is the alter ego of Targa, and because Targa actually owns the pipeline and the product being transported through the pipeline, the pipeline's owner is transporting its own product through the pipeline, disqualifying it as a common carrier. In support of this theory, T.B. Farms refers to evidence presented in the bill of exceptions regarding Targa's investor presentations and securities filings, Targa's service agreement with a third party related to right-of-way acquisition for the Pipeline, Grand Prix's transportation-service agreements, and testimony from a Targa witness who said Targa owns 75 percent of Grand Prix.[3] T.B. Farms claims such

---

[3]     T.B. Farms did not satisfy the procedural requirements for submission of a bill of exceptions. *See, e.g.*, TEX. R. APP. P. 33.2(c)(2)–(3). But as we explain below, even if it had, the evidence within T.B. Farms' bill would not change our

15

common ownership "is evidence that Targa, not Grand Prix, is the owner, transporter, fractionator, marketer to third parties and Grand Prix is the alter ego of Targa."

Some of this evidence was not before the trial court when it granted Grand Prix summary judgment on the common-carrier issue. Regardless, this evidence does not contradict that Grand Prix owns the Pipeline but simply supports that Targa was involved with the Pipeline, entered into agreements related to the Pipeline, and had an ownership interest in Grand Prix. It is also notable that T.B. Farms does not articulate why a finding that Grand Prix is the alter ego of Targa would affect the outcome of this litigation, i.e., why that would mean Grand Prix does not meet the conditions for a common carrier.

T.B. Farms' second argument is that the ELTM contract is "fictitious" and a "fraud on the trial court." T.B. Farms bases this argument on the deposition testimony of a Grand Prix corporate representative, who testified he was not familiar with either ELTM or the ELTM-Grand Prix contract. T.B. Farms contends from this testimony it is "obvious" that the ELTM-Grand Prix contract "was prepared by Targa Resources and submitted to the trial court to convince the trial court that Grand Prix was in compliance with the current case law decisions in

disposition of this appeal. Moreover, T.B. Farms points to untimely expert reports included in its bill of exceptions, but the trial court denied the motion to modify the deadline for these reports, and T.B. Farms does not argue on appeal why the untimely reports should have been allowed.

16

the State," when "[t]ruth in fact, [ELTM] had no business with Grand Prix, was unknown to the person at Targa/Grand Prix most knowledgeable about the transportation business of Targa/Grand Prix and was a document prepared by Targa for the sole purpose of convincing the trial court to rule favorably on the common carrier status." T.B. Farms' argument fails.

At a January 2022 status conference, the trial court ordered Grand Prix to produce a corporate representative who could testify about contracts between Grand Prix and two of its *other* customers, Parsley and Chevron—not its contract with ELTM. Grand Prix complied with that order. Its counsel sent an email to T.B. Farms' counsel saying they would produce a Grand Prix representative who would be prepared to testify about "Parsley and Chevron." At the deposition, T.B. Farms' counsel went beyond the Parsley and Chevron contracts and asked about the ELTM contract. Because the ELTM contract was not within the scope of the deposition, the witness' unfamiliarity with the ELTM contract is not evidence that the contract is somehow fraudulent. *See* TEX. R. CIV. P. 199.2(b)(1) (notice of deposition of corporate representative "must describe with reasonable particularity the matters on which the examination is requested").

Accordingly, T.B. Farms has not established that the trial court improperly granted summary judgment in Grand Prix's favor on the common-carrier issue. *See Hlavinka*, 650 S.W.3d at 494. We overrule T.B. Farms' first and third issues.

17

**B.**    **The trial court's disposition of T.B. Farms' counterclaims and third-party claims**

In its second issue, T.B. Farms claims the trial court erred by dismissing its counterclaims and third-party claims based on Grand Prix's "pleas to the jurisdiction." T.B. Farms appears to argue that a plea to the jurisdiction was not the proper vehicle to challenge its counterclaims and third-party claims because the common-carrier requirements of section 111.003 are defensive, not jurisdictional, and T.B. Farm's pleadings and evidence showed Grand Prix was not a common carrier. T.B. Farm's argument lack merit.

First, T.B. Farms is factually incorrect that the trial court dismissed its counterclaims based on a plea to the jurisdiction. The trial court granted summary judgment in Grand Prix's favor on most of T.B. Farms' counterclaims.[4] Indeed, the trial court's order disposing of the counterclaims states specifically that it is a ruling on Grand Prix's traditional motion for partial summary judgment,  and it

---

[4] In its final pleading, filed after the trial setting was moved because of the tornado, T.B. Farms raised a counterclaim for "abuse of the condemnation process," which it alleged was supported by the surveys of its new surveying expert. T.B. Farms moved to modify the discovery period to allow for production of the surveys and the designation of new experts. The trial court denied T.B. Farms' motion and ruled that T.B. Farms' sole expert at trial would be its valuation expert, the sole issue at trial would be the valuation of the condemned property, and T.B. Farms could not present at trial evidence related to previously rejected allegations, including "abuse of the condemnation process." Following T.B. Farms' bill of exceptions at trial, which included the surveyor's testimony, the trial court explained that the survey evidence was not produced until "well after the discovery period and everything had passed." On appeal, T.B. Farms does not challenge the denial of its motion to modify the discovery period or explain why the trial court erred by disposing of the "abuse of condemnation process" claim.

18

ordered that T.B. Farms' counterclaims for "trespass, . . . alter ego remedies (including 'Corporate Fiction' and 'Statutory Avoidance'), and the 'Constructive Trust' remedy are dismissed with prejudice." Therefore, T.B. Farms' contention that the trial court improperly dismissed its counterclaims based on a plea to the jurisdiction is incorrect.[5]

Second, as to the third-party claims dismissed pursuant to the plea to the jurisdiction, Grand Prix's jurisdictional argument was not based on section 111.003 but on Chapter 21 of the Texas Property Code and a line of cases holding that new parties cannot be joined during the de novo judicial proceeding in a condemnation case. *See* TEX. PROP. CODE §§ 21.001–.103; *see also, e.g.*, *City of McKinney v. Eldorado Park, Ltd.*, 206 S.W.3d 185, 192–93 (Tex. App.—Eastland 2006, pet. denied) ("The trial courts are also without jurisdiction over the claims of parties who were not parties to the proceedings before the special commissioners."); *Tyler Rose Nursery, Inc. v. State*, No. 12-03-00139-CV, 2004 WL 1574022, at *1 (Tex. App.—Tyler July 14, 2004, no pet.) (mem. op.) ("[A]lthough the trial is *de novo*, it is limited to the parties and issues involved in

---

[5] Regarding the merits of its counterclaims, T.B. Farms seemingly contends the bill-of-exceptions evidence supports that its "claims" should have survived. But again, such evidence does not create a fact issue on whether Grand Prix owned the pipeline, and T.B. Farms does not explain why its specific counterclaims should have survived Grand Prix's motion for summary judgment.

the administrative proceeding before the special commissioners[.]"); *Brown v. State*, 984 S.W.2d 348, 350 (Tex. App.—Fort Worth 1999, pet. denied) (same).

T.B. Farms does not cite, let alone address, any of these authorities on appeal. Without addressing the merits of Grand Prix's reliance on these authorities, we conclude T.B. Farms has not established that the trial court erred in granting the plea to the jurisdiction as to the third-party claims. *See Ollie v. Plano Indep. Sch. Dist.*, 383 S.W.3d 783, 790–91 (Tex. App.—Dallas 2012, pet. denied) (affirming trial court's grant of plea to jurisdiction as to governmental unit because appellant failed to challenge one possible ground for the ruling); *Villarreal v. Harris Cnty.*, 226 S.W.3d 537, 541 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (recognizing appellant must challenge all independent grounds supporting order granting plea to the jurisdiction).

We overrule T.B. Farms' second issue.

## C. We do not consider the trial court's dismissal of Intervenors' claims

In its fourth issue, T.B. Farms argues the trial court erred by dismissing Intervenors' claims. Because Intervenors did not file a notice of appeal, we do not consider this issue. TEX. R. APP. P. 25.1(c) ("A party who seeks to alter the trial court's judgment or other appealable order must file a notice of appeal."); *Home*

20

*Asset, Inc. v. MPT of Victory Lakes FCER, LLC*, No. 01-22-00441-CV, 2023 WL 3183322 at \*4 (Tex. App.—Houston [1st Dist.] May 2, 2023, no pet.) (mem. op.).[6]

### III. Conclusion

We affirm the trial court's judgment.

Andrew Johnson
Justice

Panel consists of Justices Rivas-Molloy, Johnson, and Dokupil.

---

[6] The trial court dismissed Intervenors' claim pursuant to Grand Prix's plea to the jurisdiction. T.B. Farms argues that the only motion Grand Prix could use to dispose of Intervenors' claims was a motion to strike the intervention. However, the cases T.B. Farms cites do not support the proposition that, even when a trial court lacks jurisdiction over an intervenor's claims, only a motion to strike may be used. *See Ramos v. Tex. Dep't of Pub. Safety*, 35 S.W.3d 723, 733 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) (affirming order granting plea to jurisdiction as to intervenors' claims). Thus, even if properly raised on appeal, we would not sustain this issue.